# CHARLESTON.

## A. S. HECK *v.* O. B. MORGAN *et al.*

### Submitted February 22, 1921.    Decided March 1, 1921.

1. ACKNOWLEDGMENT—*Conveyance of Realty May Not Be Acknowledged Except in Case of Married Woman.*

   It is not necessary to the validity of a conveyance of real estate that the same be acknowledged, except in the case of a married woman, and if a grantor under no disability signs, seals and delivers a deed without acknowledgment it will be effective between the parties to pass his title.    (p. 112).

2. DEEDS—*Possession by Grantee is Prima Facie Evidence of Delivery.*

   Possession by the grantee of a deed or instrument conveying an interest in real estate is *prima facie* evidence of its delivery. (p. 112).

3. ESCROWS—*Deed to Realty Cannot be Delivered to Grantee in Escrow.*

   A deed or other instrument conveying an interest in real

estate cannot be delivered to the grantee in escrow. A delivery to him, even though stipulated to be upon certain conditions, will be treated as an absolute delivery. (p. 112).

4. SAME—*Deed Cannot be Delivered in Escrow to Grantee's Agent to Procure It.*

A deed cannot be delivered in escrow to the agent of the grantee who is charged by his principal with the particular duty of securing it, and who represents the principal in the particular transaction resulting in the deed. The conditional acceptance of the deed by such an agent under such circumstances is inconsistent with his duty to his principal. (p. 112).

5. DEEDS—*Return of Deed by Grantee to Grantor for Acknowledgment Not a Surrender of Title.*

Where the grantee in a deed returns it to the grantor for the purpose of having it acknowledged, he does not thereby surrender the title acquired by the deed. (p. 113).

6. VENDOR AND PURCHASER—*Law Imputes Information Which Would be Conveyed by Actual Viewing of Premises.*

The law imputes to a purchaser of real estate, or an interest in real estate, all information which would be conveyed to him by an actual view of the premises. (p. 115).

7. MINES AND MINERALS—*Possession of Lessee Under Unrecorded Oil and Gas Lease is Notice to Subsequent Lessee.*

Where the lessee in an unrecorded oil and gas lease enters upon the premises, locates a well, and employs a force of men thereon in the building and construction of roads leading from the highway to such location, which roads and the work being done upon such premises by said lessee could be for no other reasonable purpose than the development of said premises for oil and gas, such lessee is in possession under his lease, and such possession will be notice to a subsequent lessee of his claim to the oil and gas in the lands. (p. 115).

8. VENDOR AND PURCHASER—*Rights of Grantee Under Recorded Deed Not Subordinate to Right of Subsequent Grantee With Notice Who Has Not Paid Price.*

The rights of a grantee under an unrecorded deed are not subordinate to the rights of a subsequent grantee from the same grantor of the same land, where it appears that such subsequent grantee, at the time he becomes fully informed of the prior grantee's rights, has not paid the purchase money. He is not a complete purchaser, and his rights are subordinate to the rights of the first grantee. (p. 116).

9.   EQUITY—*When Maxim That "He Who Comes Into Equity Must Come With Clean Hands," Affects Rights to Sue Stated.*

The maxim, "He who comes into equity must come with clean hands," does not deprive a suitor of a right to appeal to a court of equity on account of general iniquitious conduct unconnected with the act of the defendant which the complainant party sets up as his ground or cause of action, but only when the evil practices and wrongful conduct pertain to the particular matter or transaction in respect to which judicial protection or redress is sought.   (p. 117).

Appeal from Circuit Court, Roane County.

Suit by A. S. Heck against O. B. Morgan and others. Decree for plaintiff, and defendants appeal.

*Affirmed.*

*R. E. Bills* and *Thos. P. Ryan,* for appellants.

*Walter Pendleton* and *S. P. Bell,* for appellee.

RITZ, PRESIDENT:

The defendant O. B. Morgan is the owner of a small tract of land situate in Reedy district in Roane county. The plaintiff conceived the idea of developing or testing the territory in that neighborhood for oil and gas. At that time it was what is termed in the nomenclature of the oil and gas fraternity "wildcat" territory, that is, such territory as has not been reasonably demonstrated to be productive of these minerals. O. J. Brown and G. B. Davis, two residents of that neighborhood who were interested in having the same tested, undertook to assist the plaintiff in procuring leases upon such of the territory as he might desire. The plaintiff advised them that if he could procure leases on several thousand acres of land in a solid block he would incur the expense of drilling a well to determine whether or not there was oil or gas underlying the lands. Brown and Davis, together with one Byron L. Morford, plaintiff's son-in-law and agent for the purpose of procuring the leases, went into the neighborhood and secured such leases from a great number of the landowners. On the 17th of March, 1919, while Morford and Brown were engaged in this work they went to the residence of the defendant Morgan for the purpose of securing such a lease upon his

seventeen-acre tract. He was not at home, but they were
advised by his wife that he would return in all probability in
a short time. Shortly after leaving his house they met him in
the road and Brown, being acquainted with him, accosted him
in regard to securing the lease. He was advised that the
plaintiff had determined to test the territory for oil and gas
if he could secure leases upon a solid block containing several
thousand acres, and that they had already procured such
leases upon practically all of the land in proximity to his
tract. It was explained to him that Heck was paying only a
nominal consideration of five cents an acre for the leases, with
the provision to deliver one-eighth of the oil or gas produced
to the credit of the lessor, or to pay two hundred dollars a
year for each producing gas well. Morgan stated that he
had talked with another party about leasing his land, and
thought he might get more favorable terms if he waited until
the land was tested and it should turn out that it was oil-
producing territory, but finally agreed that he would not
stand in the way of securing the development in the neigh-
borhood, and agreed to execute a lease upon the terms pro-
posed to him. It then began to rain, and in order to prepare
the lease the parties stepped into a hay shed by the wayside,
and plaintiff's agent Morford filled in the blanks upon a
printed form and Morgan thereupon signed the paper and
turned the same over to Morford, Morford at the same time
giving him a check for eighty-five cents. It seems that Mor-
ford's instructions were to pay a minimum of one dollar,
but he overlooked it in this case and only made the check
for five cents an acre. It was there understood between the
parties that in the next day or two the lease would be taken
to Morgan's residence to be executed by his wife. Morgan
says that he delivered the lease to Morford with the under-
standing that he was to have a copy of it, and that it was not
to be a binding contract unless he was furnished a copy, that
if he was furnished such copy it would be all right. Mor-
ford and Brown both testify that there was no such under-
standing as this. On the next day the lease was executed
by Morgan's wife, but was not acknowledged by either of

them before a notary public, or other officer authorized to take acknowledgments. Morford says that Morgan did ask for a copy of the lease at the time he executed it, and that he was informed that a copy would be made at the office, and when a notary came around to take the acknowledgment of his wife and himself to the paper such copy would be delivered to him.

Morford turned this paper over to the plaintiff Heck with the advice that Morgan desired a copy. The plaintiff thereupon procured one C. S. McClung, a notary, to take all of the leases which he had secured and make copies of those of which the lessors desired to have copies, and then go to the residences of the various lessors and take their acknowledgments to the leases, at the time delivering the copies. McClung did make a copy of the Morgan lease among others, and did call upon the various lessors to take their acknowledgments. When he called at the Morgan residence for the purpose of taking the acknowledgment of Morgan and his wife he was advised that Morgan had gone to Gilmer county to work on a bridge, but was given his post office address. Mrs. Morgan acknowledged the lease at that time. McClung returned the lease, together with the copy of it, to the plaintiff with the advice that Morgan was not at home, and also furnished the plaintiff with Morgan's post office address, in order that he might be communicated with. There was one other lease executed by a man by the name of Wade who was also absent, and who was at work at the same place with Morgan. Heck was in the neighborhood very shortly afterward and made further inquiries as to Morgan's address, and receiving confirmation of the information given him by McClung he wrote a letter to Morgan enclosing the lease, together with the Wade lease, and asked him to acknowledge it and have Wade acknowledge his lease, and return the same to him, and in this letter enclosed a check for one dollar to pay the fees of the notary for taking the acknowledgment. He got no reply to this letter.

A short time thereafter he was informed that Morgan was at home, and with a view to getting the lease acknowledged he

called up Brown and asked him to go to Morgan's residence in his automobile and get both Morgan and his wife and take them before a notary and have the lease acknowledged. Brown did call up Morgan and advised him that he desired to call upon him and take him and his wife before an officer and have the lease acknowledged, upon which Morgan advised him that he had left the lease over in Gilmer county where he had been at work; that when he left there he did not expect to come home, but only to go to Clarksburg to have some machinery repaired, and finding that it would take longer to make the repairs than he expected he determined to make a visit to his home. Brown communicated this information to Heck. The next morning Heck met Morgan on the train returning to his work and approached him in regard to acknowledging the lease and returning it. Morgan at that time called his attention to the fact that the lease recited a consideration of one dollar when he had only received eighty-five cents. Heck thereupon informed him that this was a mistake, and that it was the first he knew of it, and offered to pay him the difference at that time, but Morgan informed him that that made no difference, that he would execute the lease whether he got any consideration or not. He made some suggestion in regard to the term being rather long, and stated that he had had a notion to change the ten years to two years and acknowledge it and return it. Heck replied to him that development would be begun at once; that he intended to begin the well immediately, and if the territory was found to be producing territory the development would be continued, and that if he had changed the lease to two years he, Heck, would likely have accepted it. He insisted upon Morgan acknowledging the paper at once and returning it to him, advising him that he desired to at once proceed with his development, but did not want to do so until he had all of the matters closed up. Morgan thereupon advised him, according to Heck, that he need not delay his operations awaiting the lease that just as soon as he returned he would acknowledge it and return it, and that he, Heck, might go on with his

plans for development with the full assurance that the lease would be acknowledged and returned to him.

Heck did immediately begin operations on an adjoining tract of land known as the Hess tract. Not receiving the lease from Morgan after waiting a considerable time, Heck wrote him a letter calling his attention to his promise to acknowledge it and return it, and advising him that he was relying upon that promise, and asking him to comply with it immediately, and also to return the Wade lease which he had theretofore sent him. To this letter Morgan made an equivocal reply in which he returned the Wade lease, but for the first time, according to Heck, raised some question about the payment of eighty-five cents not being legal, and about having a copy of the lease furnished to him which had not been furnished, and advised that they would let the matter rest until some future time. Upon receipt of this letter Heck immediately wrote him again enclosing him one dollar to take the place of the eighty-five cents which had been paid him, and advising him that as soon as he acknowledged the lease and returned it he would be furnished a copy, and asked him to do so at once. To this letter Morgan replied returning the check and advised that he did not know where the lease was unless it had been returned to him with his former letter. This letter was written about June 17, 1919.

It seems that no further communication was had with Morgan until sometime in the early part of September. Heck pursued his developments, and on the 11th of September his well on the Hess land came in a substantial producer. It seems about this time that he had another conference with Morgan, in which Morgan told him he did not know what he was going to do about his lease; that he wanted to do what was right, but he did not know what that was. It became apparent to Heck by this time that Morgan did not intend to acknowledge the lease and return it, but was endeavoring to escape the effect of it if he could do so.

In the meantime Heck had consulted counsel as to his rights upon the Morgan land, and was advised that the acknowledgment was not necessary in order to make the lease

a valid one so far as Morgan was concerned. On the evening of September 11th, at the time the well came in on the Hess land, Heck, for the purpose of protecting his interest in the Morgan land, announced to his employes and others who were present that he was going to the Morgan land and make a location for a well. Accompanied by several of his employes he did go to the Morgan place and called at the Morgan residence. Morgan was not there, but he informed Mrs. Morgan that he had secured a good well on the Hess land adjoining, and was then going to locate a well on the Morgan seventeen acres. She stated that she wished Mr. Morgan was at home, and Mr. Heck also advised that he would have been glad if Morgan were present, but that he could not delay making the location; that he thereupon measured the distance from the house, and the distance from several other points, and made a location, to indicate which he took a broom handle and with a knife flattened off one side of it, and marked thereon ''O. B. Morgan, No. 1'' and drove it into the ground; that he then advised Mrs. Morgan upon his return from the point of location that the same had been made, and that work would begin at once.

He instructed his men to proceed to this Morgan land on the next morning and commence the building of a road from the highway to the point at which the well had been located, so that material could be moved upon the land preparatory to drilling a well, but on account of some happening at the Hess well the services of the men were required there, and they did not go upon the Morgan land for the purpose of commencing the work there until Monday morning, the 15th day of September. At that time a force of men did go upon the Morgan land and begin the construction of a road leading from the highway to the point where the well had been located. Mrs. Morgan advised these men that they were trespassers upon the land and demanded that they cease their work. They disregarded her request and proceeded therewith.

On the next day Morgan and his wife went to the city of Parkersburg and there got in communication with the defendant R. E. Bills, as a result of which they executed to him a lease for oil and gas development upon this same tract of land.

The terms of this lease were agreed upon according to the testimony of Bills and Morgan on the 16th, but the lease was not executed until the next day.  Bills paid for this lease, according to the evidence, the sum of one dollar, and by a collateral contract gave Morgan a one-sixteenth interest in the operations to be carried on upon the land, agreeing to furnish the money for Morgan's one-sixteenth interest to the extent of drilling in one well, after which time Morgan should pay his share of the expenses of operation.  On this same day a notice was prepared by Bills to Heck requiring him to cease trespassing upon the land, and notifying him that he had no right thereon for the purpose of operating for oil or gas.  Morgan brought this notice back with him upon the evening of the 17th, and on the next morning, shortly after eight o'clock, when the men resumed their work on the construction of the road, he served the same upon the foreman in charge, who immediately called the plaintiff on the telephone and read the notice to him.  The plaintiff advised him to pay no attention to it, but to proceed with the work, and this was done.   The work upon the construction of the road proceeded continuously until it was completed about the 24th of September, and on the next day Heck began hauling material upon the ground for the purpose of beginning operations.

Likewise on the 24th of September Heck instituted this suit for the purpose of setting up the lease, which Morgan and his wife had executed, as a lost instrument, Morgan claiming that he had lost it or destroyed it, and for the purpose of cancelling the lease executed by Morgan to Bills as a cloud upon his right to develop the land for oil and gas.  On the 23rd of September it appears that Bills had some negotiations with the defendant C. T. Smith which resulted in an assignment of this lease by Bills to Smith, Smith assuming all of Bills' obligations to Morgan under the collateral contract above referred to.   At the time the plaintiff brought this suit he was not advised of this assignment of Bills to Smith, and did not make Smith a party defendant.  In fact, the assignment to Smith  was not placed upon the record until some days after the suit was brought.   While

the assignment to Smith is dated on the 23rd of September, and consists of only a few lines, it was not acknowledged until the 24th, and not recorded until the 26th of September.    In addition to assuming Bills' obligations to Morgan, it is claimed by Bills and Smith that Smith paid Bills eight hundred dollars for the assignment, and a check is filed dated the 23rd of September for this amount which it is shown was paid on the 27th of that month.    Plaintiff then filed an amended bill making Smith a party defendant, and in addition to the relief asked for in the original bill asked that the assignment from Bills to Smith be also cancelled and set aside as a cloud upon his title.    Bills claims that at the time he took the lease from Morgan he knew nothing about any claim that Heck had to the land, and that Morgan assured him at that time that there was no lease upon the land, and that he had a clear right to make the lease to him, notwithstanding on the very same day Bills prepared the notice to Heck above referred to.    He claims, however, that this notice was prepared after the lease had been executed and delivered.    Smith, likewise, claims that at the time he took the assignment from Bills, he had no notice of any claim upon the part of Heck, or anybody else.    Bills admits that he was fully advised that Heck was claiming the right to drill this land for oil and gas at the time he made the assignment to Smith, and that while Smith was a partner of his in business and closely associated with him, he withheld the information he had in this regard from Smith.

It is insisted that the plaintiff is not entitled to the relief he asks for the reason that the paper executed by Morgan and delivered to Morford on the 17th day of March was not effective because the same had not been acknowledged; that it was delivered to Morford upon condition that it would take effect only in the event that a copy thereof was furnished to Morgan, and that this copy not having been furnished, there was never any delivery of the paper; that even though the paper executed by Morgan was valid as a lease between him and Heck, Bills as a bona fide purchaser without notice of Heck's claim could not be affected thereby, inasmuch as the record did not disclose Heck's interest, and that even though it should be held that Bills purchased

with notice of Heck's rights, still the defendant Smith was such innocent purchaser and is protected.

The circuit court entered a decree establishing the plaintiff's lost lease as a valid and binding contract, and from a copy of it which was duly proven fixed the terms, and further cancelled the lease made by Morgan to Bills and the assignment by Bills to Smith as constituting clouds upon the plaintiff's rights, and enjoined the defendant Morgan from interfering with Heck in his operations upon the land.

Is there any merit in the contention of the defendant Morgan that the paper was not effective because he had not acknowledged it? As between the parties, there is no necessity for the acknowledgment of a deed. If it is properly signed, sealed and delivered, it is just as effective to convey the grantor's title as though it had been acknowledged. The purpose of an acknowledgment is to supply the proof necessary to have it admitted to record, except in the case of a married woman, where by the language of the statute, an acknowledgment is necessary to the validity of the deed. *State* v. *Proudfoot,* 38 W. Va. 736-745; *Washington County* v. *Dunn,* 27 Gratt. 608; *Webb* v. *Ritter,* 60 W. Va. 193; 1 C. J. 750.

The principal contention of the defendant Morgan, however, is that this lease was delivered by him to Morford upon condition that it would be valid only if a copy were furnished him, and that inasmuch as this copy has never been furnished there was never any effective delivery, and when the lease came back into his hands he had a perfect right to destroy it. The evidence does not bear out his contention that this lease was delivered upon any such condition as he now sets up. Morford and Brown swear positively that there was no such condition attached to the delivery. Morford admits, as we have before stated, that he did agree to furnish Morgan a copy, and it is shown that a copy was made for that purpose, but that this was a condition to the validity of the instrument is denied emphatically by both Brown and Morford. Possession of an instrument of this character by the grantee is *prima facie* evidence that it was delivered to him with the intention that it should convey the grantor's

title, and it might be very well said that Morgan has failed to overcome this presumption. Aside from this, however, it is well settled that a deed, or any instrument conveying an interest in real estate, cannot be delivered to the grantee upon condition, or, in other words, delivered in escrow. Such conditional delivery can only be made to a stranger to the transaction. *Dorr* v. *Midelberg*, 65 W. Va. 778, and authorities there cited. The delivery in this case, of course, was not made direct to the grantee, but it was made to Morford, his agent. It seems that formerly a conditional delivery could not be made to an agent of the grantee, but the tendency of the modern holdings is that the grantee's general agent may be entrusted with the instrument to be held in escrow. This doctrine has been extended no further, however, than to permit the delivery upon condition to such an agent as owes no duty towards his principal in regard to the particular transaction. In other words, if the conditional delivery is made to the agent who is conducting the particular negotiations on behalf of the principal, it would be entirely inconsistent with the specific duty with which he is charged, and the delivery to him would be in effect a delivery to the grantee. 10 R. C. L., title "Escrow" § 13; *J. I. Case Threshing Machine Co.* v. *Barnes*, 133 Ky. 321, 19 Am. & Eng. Anno. Cas. 246, and monographic note at page 250. In this case Morford, being the agent of the plaintiff for the very purpose of conducting this transaction, and receiving on behalf of his principal the lease, it would be entirely inconsistent with this duty for him to act in the capacity of agent for both parties to hold the instrument in escrow. The delivery to him was therefore an absolute delivery, even though there may have been attached thereto the condition to which Morgan testifies.

Nor is there anything in the contention of the defendant Morgan that when the lease executed by him came back into his possession for the purpose of having it acknowledged it deprived the plaintiff of any rights which he might otherwise have had thereunder. If this paper was effective to vest in the plaintiff any interest, he could only be divested

thereof by a grant from him or in some other way provided by law. The fact that the grantor came into possession of the instrument for the purpose of acknowledging it would not have the effect to divest the grantee of his title acquired thereunder. *Rootes* v. *Holliday,* 6 Munf. 251.

The defendant Bills, however, claims that he was a purchaser for value in good faith, and without notice of the plaintiff's rights under the lease which had been theretofore executed to him by Morgan, and that therefore his rights under the lease executed to him by Morgan in September, 1919, are superior to the rights of the plaintiff, and this would be correct if the facts justified this conclusion, for under our recording statutes the plaintiff's lease would be void as to a purchaser for value in good faith without notice. Is the defendant Bills such a purchaser? It is contended: first, that he had actual notice of the plaintiff's rights, notwithstanding his denial, and that even if he did not have such actual notice Heck had such possession of the premises at the time of his purchase as to amount to notice; and second, that even though he had no notice whatever, still he was not a complete purchaser for the reason that he had not paid the consideration agreed upon between him and Morgan. Bills swears that at the time he took the lease from Morgan he did not know of Heck's claim, and had no information whatever in regard thereto, and Morgan swears that he gave him no such information, but on the contrary had told him that there was no adverse claim of any kind to the land. It is significant, however, that on the very day on which this lease was executed and delivered Bills prepared a notice to Heck advising him to cease trespassing upon the land, and further advising him that he had no right to operate the same for oil and gas. This notice clearly implies that the one who prepared it knew that Heck was making some claim of a right to conduct operations upon this land for oil and gas. But Bills says that while this notice was prepared by him on the 17th it was after the delivery of the lease to him, and after that transaction was closed. This may be true, but it is hardly credible. Morgan puts

himself in the position of making a clear-cut false and fraudulent representation to Bills, for he admits that he himself knew that Heck was claiming a right to develop the land for oil and gas at the very time that he made the representation to Bills, and it may be said that the evidence of one who swears that he is willing to commit positive fraud of this kind is not entitled to very much credence when in conflict with the circumstance of the preparation and giving of the notice to Heck.

However, it is unnecessary to determine whether Bills had actual notice of Heck's claim or not. The evidence shows that Heck had taken possession of this land prior to the execution of this lease to Bills; that he was then at work upon it with a force of men building a road leading to the location he had established for an oil well. The surface of the land is a part of the record of which a purchaser must take notice, and it is clear from the evidence that had Bills looked at this land at the time he took his lease he could have come to no other conclusion but that someone was preparing to conduct operations thereon for oil and gas, and it would then have been his duty to make inquiry as to the rights claimed by such party. In *Pocahontas Tanning Co.* v. *St. Lawrence Boom & Mfg. Co.*, 63 W. Va. 685, it was held that one who has knowledge or information of facts sufficient to put a prudent man on inquiry as to the existence of some right or title in conflict with that which he is about to purchase is bound to pursue the same, and to ascertain the extent of such prior right. There can be no doubt that the conduct of Heck upon this tract of land was sufficient to put anyone upon notice that oil operations were about to be carried on upon it. The road which was under construction at the very time of the making of the lease to bills was consistent only with that purpose. It appears that the tract of land had not been farmed for sometime; that it had grown up in sprouts and brush, and that it had a small orchard upon it; that a wagon road over which heavy hauling could be done, such as was being constructed by Heck, was entirely useless for any purpose to which the farm was be-

ing devoted by Morgan, and particularly is this true when we consider the point to which the road led. Then, too, oil development was going on in the neighborhood; a well had just come in on an adjoining tract of land, and it was perfectly apparent to anyone that the purpose of the work being done by Heck upon this land was to produce oil therefrom. It is, therefore, quite clear that if Bills had looked at the land at the time he took the lease he would have been informed from the appearances that someone else was asserting a right to the oil and gas, and it would have been his duty to have made inquiry and ascertained just what this right or claim was. But Bills says he did not in fact look at the land, and that he can only be charged with such information as he actually had. Was Bills charged with knowledge of the facts of which he would have been informed had he made an examination of the land? If he is, then he had notice, or is charged with knowledge of such facts as would give him notice of Heck's rights. In *Mills* v. *McLanahan*, 70 W. Va. 288, the defense of innocent purchaser was made. Mills was in possession of the land under a title bond which had been executed many years before, and which had been lost, and a subsequent purchaser from Mills' grantor claimed that he was not chargeable with any knowledge as to Mills' rights, but this court held that the law imposed upon such subsequent purchaser the duty to make an investigation, and imputes to him notice of all facts which such an investigation would have disclosed, and of all the rights of those in possession. Many authorities are cited in that case to support that view, and it seems to be the established law of this state. It, therefore, follows that Bills, being under a duty to take notice of all facts which an investigation upon the land would disclose, is not an innocent purchaser without notice of Heck's rights, the situation being such as to disclose facts which would inform him of those rights.

There is another reason why Bills is not such a purchaser as is protected, and that is that he had not paid the consideration at the time he admittedly was fully informed of the situation. The real consideration which Bills was to pay for

this lease was to bear Morgan's share of the expense of drilling the first well thereon. He only gave, according to his own contention, a nominal consideration of one dollar at the time the lease was executed, while the real consideration, assuming that it would cost as much to drill a well on this land as the evidence shows it did on the adjoining land, would be between seven and eight hundred dollars, no part of which had been paid, or has even yet been paid so far as this record discloses. Notice of prior existing rights received by a purchaser of property before he has paid the purchase money is equivalent to notice before the contract of purchase. He is not a complete purchaser until the consideration has been paid. He was in a position after he was fully informed of the rights of the prior purchaser to fully protect himself by withholding the consideration which he was to give. *Welch* v. *King,* 82 W. Va. 258; *Webb* v. *Bailey,* 41 W. Va. 463.

For either of the foregoing reasons Bills is deprived of the defense of innocent purchaser for value without notice. What we have said as to the duty of Bills to ascertain what was being done upon the land, and its effect to deprive him of the defense of innocent purchaser, applies with even greater force to the defendant Smith. At the time Smith took the assignment from Bills, the road was completed and indicated unmistakably its purpose.

The appellees contend that the plaintiff's bill should be dismissed for the reason that he attempted to practice a fraud upon the defendant Morgan subsequent to the bringing of this suit. There is evidence that after this suit was brought the plaintiff discovered what he conceived to be a defect in the title of Morgan to the land in controversy, and went to Morgan's vendor, and procured from him upon what are termed fraudulent representations a quit-claim deed for the land, because of which conduct the appellee Morgan now insists the plaintiff should be denied relief. It is quite true that equity will not lend its aid to enforce an unconscionable contract or one procured by fraudulent means. Ordinarily one who comes into equity must come with clean hands,

but this maxim extends no further than to deny relief to one who has acted fraudulently or inequitably in regard to the contract involved in litigation. It does not extend to the conduct of a party generally. The matter set up here which it is claimed should defeat the plaintiff's right to maintain this suit has no connection with the contract sought to be enforced. It was conduct subsequent to the making of that contract, and subsequent to the institution of this suit to establish it, and even admitting that the plaintiff's conduct in regard to that transaction was not free from censure, it has no bearing upon the contract involved here, or upon the rights of the parties involved in this litigation. The evil conduct or iniquitious practice which is relied upon to defeat the suit must be in connection with the particular matter or transaction in respect to which judicial protection or redress is sought. 10 R. C. L., title "Equity" § 140.

Our conclusion is to affirm the decree complained of, and it is so ordered.

*Affirmed.*