[No. 25004.   Department Two.   November 15, 1934.]

E. G. DODGE, *as Special Administrator, et al., Appellants,* v. E. W. SCRIPPS, *Individually and as Trustee, et al., Respondents.*[1]

[1]Reported in 37 P. (2d) 896.

*Chadwick, Chadwick & Mills* and *McAdoo & Neblett,* for appellants.

*Bayley & Croson* and *S. S. Hahn,* for respondents.

TOLMAN, J.—At the time of his death on March 11, 1932, Byron H. Canfield was the owner of substantial blocks of stock in ten corporations, known as the Scripps-Canfield League, which owned and operated as many newspapers. Five of these papers, Seattle Star, Tacoma Times, Spokane Press, Portland News and Los Angeles Record, had, for some years prior to 1921, been controlled and operated by James G. Scripps, and had been known as the James G. Scripps newspapers. James G. Scripps died in 1921, leaving to his widow, Josephine Scripps, his interest in the corporations owning these newspapers. He left four minor children, the eldest of whom, E. W. Scripps, was at that time about twelve years of age.

Canfield had for many years been employed by the Scripps newspapers in various responsible capacities, and at the time of the death of James G. Scripps had acquired substantial blocks of stock in the corporations which owned and operated the above mentioned newspapers. Likewise, Le Roy Sanders, also for many years a trusted employee of the Scripps newspapers, was an owner of a considerable amount of stock in those corporations. The stockholdings of Mrs. Scripps, Canfield and Sanders gave them complete control of the corporations and the newspapers. In fact, the only other stockholders, then or thereafter, were employees or ex-employees of the Scripps or Scripps-Canfield newspapers.

October 22, 1921, Mrs. Scripps, Canfield and Sanders entered into an agreement whereby Canfield and Sanders gave Mrs. Scripps a preference right to purchase their stock in the various corporations, if ever

they desired to sell. Canfield and Sanders gave each to the other a preference right to purchase his stock in case Mrs. Scripps did not exercise her preference right. It was provided that the sale price should be determined by the "rule of three," which was a method of valuation originated many years before by E. W. Scripps, the elder, to determine the value of stock in the corporations owning and operating the original Scripps-McRae chain. Mrs. Scripps bought the Sanders stock in 1928. At about that time, the chain of newspapers became known as the Scripps-Canfield League.

In the meantime, Mrs. Scripps, Canfield and Sanders had acquired the controlling interest in Telegram-Tribune Publishing Company, operating a newspaper at San Luis Obispo, California; Capitol News Publishing Company, operating a newspaper in Boise, Idaho; Coeur d'Alene Press Company, operating a newspaper at Coeur d'Alene, Idaho; Cache Valley Newspaper Company, operating a newspaper at Provo, Utah; and Herald Corporation, publishing a newspaper at Logan, Utah.

Subsequent to the execution of the contract of October 22, 1921, Canfield became "chairman of the board" of the various corporations, with practically dictatorial power over the corporations and the newspapers. He exercised such power, however, in accordance with policies agreed to by Mrs. Scripps and Sanders. Executive heads of the various newspapers were usually consulted with respect to problems of the newspapers under their particular direction. But the final word in the management of the corporations and the newspapers was sent out from a "central office" established by Canfield shortly after he became chairman of the board of the original five companies constituting the James G. Scripps newspapers. This

central office was established at Oakland, California, where it was maintained until 1930, when it was removed to Seattle.

This central office, although not a legal entity, was, as to the various newspapers and the corporations owning them, as the brain to the nerves of the body. From it emanated all managerial policies of the corporations and editorial policies of the newspapers. Minutes of stockholders' and directors' meetings were there prepared in advance and mailed to the administrative heads of the corporations, with minute directions as to the holding of the meetings, the adoption of resolutions and the recording of the minutes.

Into the central office flowed a small percentage of the gross receipts and all of the net receipts of all of the corporations in the chain. Following a precedent long before set by E. W. Scripps the elder, Canfield allocated seventy-five per cent of the net earnings to dividends and twenty-five per cent to treasury reserve. Generally speaking, this reserve was maintained as a margin of safety to cover depletion and obsolescence of equipment and property, for managerial and other expenses incident to the operation of the newspapers. It was carried in one general account in the name of the treasurer, as trustee for each corporation to the extent that each had contributed to it.

For accounting purposes, the treasury reserve was allocated to various reserve accounts in anticipation of particular needs. It is unnecessary to describe these reserve accounts in detail, because we are not here concerned with the expenditure of funds making up the treasury reserve. Generally, we are concerned with investment of surplus funds in the treasury reserve; particularly, we are concerned with loans made to Canfield from such surplus. But before going into that, it is necessary to describe a policy with reference to the

312

investment of reserve funds, which originated with the elder Scripps, and which prevailed throughout Canfield's regime.

For many years, it had been the Scripps policy to encourage investment by their employees in stocks in the corporations owning and operating newspapers. Surplus funds in the treasury reserve were used to assist employees in the purchase of stock. A loan of an amount sufficient to purchase the stock would be made from the reserve fund to the employee. The employee would sign a note for the amount, and execute an agreement pledging the stock purchased to secure the note.

Later on during the Canfield regime, to further facilitate the acquisition of stock by employees, three investment or holding companies were formed: First Coast Investment Company, Second Coast Investment Company, and Scripps-Canfield Company. The only difference in the routine then was that the holding company purchased the stock in the newspaper corporation and issued its own stock to the employee, which he pledged to secure his note.

The transaction was financed through the use of treasury reserve funds. The treasurer of the companies (for many years J. W. Curts) was the trustee under the pledge agreements. We shall have occasion to refer to these pledge agreements more particularly later on. It appears from the evidence that, at the time of the trial of this case in 1933, there were some two hundred of such transactions on the books of the central office. Canfield himself had acquired stock in the original five of the James G. Scripps newspapers through loans made to him by James G. Scripps. At the time of the latter's death in 1921, Canfield owed him some thirty-five thousand dollars or forty thousand dollars, on account of such loans.

There was another practice with reference to the use of surplus funds, originated by E. W. Scripps the elder, which was adopted by Canfield and Mrs. Scripps. E. W. Scripps, being for many years the controlling stockholder of his companies, was accustomed to borrow surplus funds for his own purposes. However, he charged his treasurer to see to it that such borrowings should never exceed the amount to which he would be entitled as a stockholder if the surplus were disbursed in dividends. Adopting and following this policy, Canfield's borrowings from the reserve fund, at the time of his death, amounted to $113,530.89. At that time, Mrs. Scripps owed the reserve fund three hundred thousand dollars.

The amount owing by Canfield was the accumulation of borrowings extending over a period of eight years or more. At the time of his death, the indebtedness was evidenced by a demand note, dated January 31, 1932. The note was payable to E. W. Scripps (the eldest son of Josephine Scripps, and one of the defendants herein), Trustee, who was also treasurer of the Scripps-Canfield corporations, and, as such, custodian of the treasury reserve fund. As security for this indebtedness, E. W. Scripps, as trustee, held all of Canfield's stocks in the corporations comprising the Scripps-Canfield League, except seven hundred fifty shares in Record Publishing Company. This stock was held in pledge under one of the standard forms of pledge agreements hereinbefore referred to. The salient feature of it, so far as we are here concerned, is that it provided for sale of the pledged stock if there should be a default in the payment of either principal or interest for more than fifteen days.

The seven hundred fifty shares of Record Publishing Company stock above referred to was held by E. W. Scripps, as trustee, under a similar pledge

agreement to secure a note of Canfield's for $39,825.49, payable to Josephine Scripps. This note was dated January 20, 1932, but it represented Canfield's indebtedness to James G. Scripps, hereinbefore referred to. Josephine Scripps also held a note of Canfield's for one hundred thousand dollars, dated October 22, 1929. This note was secured by a pledge to E. W. Scripps, as trustee (under a similar agreement), of the same stocks as were held as collateral to secure the $113,530.89 loan from the reserve fund—subject, of course, to the pledge to secure the latter loan.

To sum up the situation at the time of Canfield's death: E. W. Scripps held all of Canfield's stock in the ten newspaper companies and the three holding companies to secure a total indebtedness of $253,356.38. Josephine Scripps at that time owed the reserve fund three hundred thousand dollars, which was secured by stock in the various corporations under a similar pledge agreement with E. W. Scripps, as trustee. At the same time, E. W. Scripps, as trustee, held stock of numerous employees of the newspaper corporations under similar pledge agreements to secure loans from the reserve fund.

It is to be remembered that E. W. Scripps is the son of Josephine Scripps and is the heir apparent to the Scripps newspapers. He became treasurer of the corporations comprising the Scripps-Canfield League and the holding companies in 1930, shortly after attaining his majority. Canfield continued as chairman of the board until February 10, 1932, when he was summarily discharged by Josephine Scripps, E. W. Scripps and James G. Scripps (the second son). E. W. Scripps thereupon assumed the title and the duties of chairman of the board. As such, he succeeded to the plenary powers that had been exercised by Canfield. (Be it said this assumption of title and power was

thereafter duly ratified by the stockholders of the various corporations.)

We now find the functions and powers of treasurer and chairman of the board combined in one person. In May, 1931, Josephine Scripps had executed a power of attorney to E. W. Scripps, under which he acquired complete control of her stock in the various corporations. So at the time of Canfield's death, we find E. W. Scripps in a position of absolute control of the three holding companies and the ten newspaper corporations.

Canfield died testate in California, where his will was admitted to probate in the superior court of Santa Barbara county. Josephine Scripps was named executrix in the will. Upon her refusal to act, the court appointed E. G. Dodge, one of the plaintiffs herein, special administrator with general powers. The heirs named in the will (also plaintiffs herein) are Harriet S. Canfield, Alice L. Canfield, Robert H. Canfield (sisters and brother of the testator), Karel Hensel and C. W. Van Dusen.

The will was contested by one Jessica Kingsland, who claimed to have been Canfield's common law wife. Upon trial of the issue, a jury returned a verdict sustaining the contestant's claims. This verdict was returned in October, 1932. Shortly thereafter, Mrs. Josephine Scripps made formal demand on E. W. Scripps, as trustee under the pledge agreements by which the latter held Canfield's stocks as security for the notes of $39,825.49 and $100,000, owned by her. On November 1st, E. W. Scripps mailed a notice to all the plaintiffs and to Ann E. Murphy, who, in the meantime, had been appointed special administratrix of Canfield's estate by the superior court of King county, that, unless the full amount of principal and interest due on the notes held by Mrs. Scripps, and also the one

316

to himself, as trustee for $113,530.89, be paid on or before November 15, 1932, he would proceed to sell Canfield's stocks, in accordance with the provisions of the pledge agreements. Payment was not made, so on November 15, 1932, E. W. Scripps, pursuant to the provisions of the pledge agreements, gave notice that he would sell the Canfield stocks on January 16, 1933.

This action was brought to enjoin the sale. After a trial on the merits, the court entered judgment dismissing the action. Plaintiffs appeal.

■ A pledgee of personal property, acting under his power to sell, is bound to exercise the utmost good faith. He must exercise the power with a view to the debtor's interests as well as his own. "The sale must be fair and the contract must be benignantly construed for the debtor's interest as well as that of the pledgee." *Foote v. Utah Commercial & Savings Bank,* 17 Utah 283, 54 Pac. 104; *Muhlenberg v. Tacoma,* 25 Wash. 36, 64 Pac. 925; *Clark v. Simmons,* 150 Mass. 357, 23 N. E. 108; *Hagan v. Continental Natl. Bank,* 182 Mo. 319, 81 S. W. 171; *Hudgens v. Chamberlain,* 161 Cal. 710, 120 Pac. 422. In the case last cited, the court said:

"The responsibility of the pledgee to the pledgor is similar to that of a trustee; he holds the stock for specific purposes,—namely, to return it to the pledgor should the indebtedness it is given to secure be paid, or if under a power of sale it is disposed of, to pay over to the pledgor any surplus which may remain, and as an incident to such trust relation, the power of sale which is vested in the pledgee must be exercised with ordinary care and prudence and in good faith for the benefit of both the pledgor and the pledgee, and to obtain what the stock is worth at the time the pledgee concludes to sell it."

■ Mr. Scripps' position of treasurer, chairman of the board and dominant stockholder (for this he was by reason of his control of the family holdings),

imposed upon him the duty of exercising his powers in the utmost good faith. In equity and good conscience, he could not use the reserve funds to his own advantage and to the disadvantage of minority stockholders. *Jones v. Missouri-Edison Electric Co.*, 144 Fed. 765; *Jackson v. Ludeling*, 88 U. S. 616; *Oliver v. Oliver*, 118 Ga. 362, 45 S. E. 232; *Southern Pacific Co. v. Bogert*, 250 U. S. 483, 39 S. Ct. 533; *Kavanaugh v. Kavanaugh Knitting Co.*, 226 N. Y. 185, 123 N. E. 148. In the case last cited, it is said:

"When a number of stockholders constitute themselves, or are by the law constituted, the managers of corporate affairs or interests they stand in much the same attitude towards the other or minority stockholders that the directors sustain, generally, towards all the stockholders, and the law requires of them the utmost good faith. . . .

"A court of equity will protect a minority stockholder against the acts or threatened acts of the board of directors or of the managing stockholders of the corporation, which violate the fiduciary relation and are directly injurious to the stockholders. . . . The courts cannot pass upon the question of the expediency of the dissolution for that is the very question which the legislature has authorized the board of directors and the stockholders to decide. They can, however, and will, whenever the facts presented to them in the appropriate action demand, inflexibly uphold and enforce, in accordance with established equitable principles, the obligations of the fiduciary relation. The good faith of the individual defendants is a proper and fundamental subject to be adjudged. Bad faith, fraud or other breach of trust constitutes a foundation for equitable relief."

As we have seen, the stock of the Scripps companies was closely held. The Scripps family owned approximately seventy per cent, Canfield fifteen per cent, and the employees fifteen per cent. It was traded in only within this narrow circle. We think it is apparent

that the Scripps policy was to confine stockholdings within the family circle and among the employees of the companies. The stock was not traded in on the open market. Under such conditions, a court of equity will critically scrutinize the conduct of the pledgee and trustee. His compliance, under such conditions, with legal formalities will not suffice to discharge his obligation to deal fairly with the stockholder and pledgor. *Wright v. Oroville Gold etc. Mining Co.*, 40 Cal. 20; *Montague v. Dawes*, 14 Allen (Mass.) 369. In the *Wright* case, the court said:

"But the Courts of equity, in dealing with the relations between the corporation and its officers upon the one hand, and the stockholders upon the other, in the management of the corporate affairs, look beyond the mere observance of the forms of law, and inquire if the authority has been, in good faith, exercised to promote the interest of the stockholders. The corporate authority is considered to have been conferred by the stockholders upon the trust and confidence that it will be exerted at least with the view to advance the interest of the stockholders, and not used with a purpose to injure or destroy that interest. And it is settled that Courts of equity in this country will, at the instance of a stockholder, control a corporation and its officers, and restrain them from doing acts even within the scope of corporate authority, if such acts, when done, would, under the particular circumstances, amount to a breach of the very trust upon which, as we have seen, the authority itself has been conferred."

In the *Montague* case, it is said:

"One who undertakes to execute a power of sale is bound to the observance of good faith and a suitable regard for the interests of his principal. He cannot shelter himself under a bare literal compliance with the conditions imposed by the terms of the power. He must use a reasonable degree of effort and diligence to secure and protect the interests of the party who intrusts him with the power. A stranger to his proceed-

ings, finding them all correct in form, and purchasing in good faith, may not be affected by his unfaithfulness. But whenever his proceedings can be set aside without injustice to innocent third parties, it will be done upon proof that they have been conducted in disregard of the rights of the donor of the power. When a party who is intrusted with a power to sell attempts also to become the purchaser, he will be held to the strictest good faith and the utmost diligence for the protection of the rights of his principal. If he fail in either, he ought not to be permitted thereby to acquire any irrevocable rights which he can set up against the party whose interests he has sacrificed.''

With these drastic rules clearly in mind, we can do no better (even at the risk of some repetition) than to quote liberally from the very able memorandum opinion of the trial court, who saw and heard the witnesses.

''There is insufficient evidence of breach of fiduciary duty by the control to warrant the application of the dominant stockholder doctrine.

''In reaching this result, I assume for the purpose of this case that the pledged stocks have a value above the amount of the loans which would impel the intervention of equity if otherwise warranted. A showing of excess value without more, however, does not constitute a ground for relief.

''This court adopts the view that a dominant stockholding interest occupies a fiduciary relationship to minority stockholders. This relationship makes it inequitable for the control to do anything to or with the common property for their own profit, to the detriment of others who have the same rights. The control is under a duty toward the minority—

'' 'to exercise good faith, care and diligence to make the property produce the largest possible amount, to protect the interests of the holders of the minority of the stock, and to secure and pay over to them their just proportion of the income and of the proceeds of the corporate property.' *Wheeler v. Abilene Nat. Bank Bld. Co.*, 159 Fed. 391 (8 C. C. A.); 16 L. R. A. (N. S.)

**892.** *Jones v. Missouri-Edison Electric Co.,* 144 Fed. 765 (8 C. C. A.)

"This court further adopts and follows what it believes to be a sensible and practical view of corporate entities. Equity should regard the substance rather than the form. It is not 'good conscience' for a Chancellor to accord to a corporate entity greater sanctity than the dominant stockholder accords to that entity when the acts and conduct of the dominant stockholder with reference to either the corporation or the minority are in issue. The existence of intermediate holding corporations is unimportant.

" 'It is the fact of control of the common property held and exercised and not the particular means by which or manner in which the control is exercised, that creates the fiduciary relation.' *Southern Pacific Company v. Bogart,* 250 U. S. 483, 63 L. Ed. 1099.

"Does the proposed sale violate the salutary rule above noticed? There is no sufficient showing that the dominant stockholding interest or the trustee will profit personally or differently than any other stockholder in the companies. At this stage of the matter this court will presume that neither the dominant stockholding interest nor the trustee will personally profit from the foreclosure of the pledge. This presumption suggests a fatal weakness in the contention that the application of the dominant stockholder doctrine would avail plaintiffs.

"Of controlling importance, however, there is no sufficient showing that the Canfield heirs will be damaged more or differently than any other debtor in like circumstances who is not a stockholder. In other words, there is no showing of damage sustained by the minority as a class, or of detriment suffered by the Canfield heirs as a part of that minority, by the foreclosure. Nor does it appear that the foreclosure is contrary to the best interests of the corporations. These are the elements which are of the essence of an actionable wrong by the control. If there be no violation of the principle that a corporation is in equity the trustee of the common property for all the stockholders, and no detriment to that common property by the actions of the control, how can it be said that a

minority stockholder as such has been oppressed or wronged?

"It is here particularly important to recognize the dual position occupied by plaintiffs. They are debtors; they are also stockholders. The soundness of this necessary distinction is apparent if a situation be assumed where a stockholder is also a debtor to a corporation with but part of his stockholdings therein pledged to secure the debt. Under such circumstances, the foreclosure of the pledge is but the lawful pursuit of the pledged property of the debtor and not the oppression of a stockholder as such, because as to the unpledged stock, the debtor-stockholder has not been disturbed or wronged. If the rule were otherwise, a corporation could not request the foreclosure of stock pledged to secure an admitted past due indebtedness, if the pledged stock happened to be its own stock. The protest of the pledgor would thus become an effective bar to the enforcing of the pledge.

"The benefit, if any, flowing from the foreclosure is not a benefit accruing to the control as distinguished from a benefit accruing to all the stockholders of the defendant corporations. The action of the control in the case at bar, if profitable, benefits all of the stockholders of the several defendant corporations, majority and minority alike. The minority are not being treated differently than the majority. True, one minority stockholder (Canfield) may be seriously damaged if the pledged stock is sold for less than its real worth, but if so, it is damage sustained as a debtor and not as a stockholder.

"The facts in the case at bar do not bring it within the application of the dominant stockholder doctrine evidenced in *Farmers' Loan & Trust Co. v. New York & N. Railway Co.,* 44 N. E. 1043 (N. Y.), where the control (another corporation) designedly brought about a default of a bond issue for its benefit and to the damage of minority stockholders. The control in the present case have not designedly reduced dividends so as to bring about a default of the Canfield notes. The dividend practice now is the same as during Canfield's lifetime. Smaller profits have meant smaller

dividends. Newspapers are not immune from the current business depression. The same proportion of net profits, however, are now being declared as dividends as in years past.

"Nor is the control of the defendant corporations at stake, as in *Luther v. C. J. Luther Co.*, 94 N. W. 69 (Wis.). Irrespective of the outcome of this litigation, the control remains where it has long been,—at least where it has been since August, 1931, in Josephine S. Scripps and her children.

"Nor are corporate funds or credit being used to divest the minority of its voice in corporate affairs or to establish perpetual control as in *Rabotham v. Prudential Insurance Co. of America*, 53 Atl. 842 (N. J.).

"Nor is control being used to make valueless the minority stock as in *Southern Pacific Co. v. Bogart*, 250 U. S. 483, 63 L. Ed. 1099, or bonds as in *Pennsylvania Canal Co. v. Brown*, 235 Fed. 669 (3 C. C. A.).

"Nor is the majority selling to itself (merger, consolidation) to the manifest injury of the minority, as in *Outwater v. Public Service Corporation*, 143 Atl. 729 (N. J.), or in *Wheeler v. Abilene Nat. Bank Bldg. Co.*, 159 Fed. 391 (8 C. C. A.), or in *Jones v. Missouri-Edison Electric Co.*, 144 Fed. 765 (8 C. C. A.).

"Nor is the control attempting a dissolution for its gain and to the detriment of a minority, as in *Kavanaugh v. Kavanaugh Knitting Co.*, 123 N. E. 148 (N. Y.), or in *Theis v. Spokane Falls Gas Light Co.*, 34 Wash. 23.

"Granting to the dominant stockholder doctrine the full vigor of a wise and beneficent rule of law which should be extended and not limited, brushing aside all incidental obstacles and technicalities, and looking through the confusion of corporations, relationships, capacities and accounting practices, plaintiffs' evidence fails to bring this case within its generous application.

"If this action is to be construed as an action to compel the declaration of dividends, the evidence falls short of warranting such action on the part of this court. A conversion of a reasonable proportion of surplus into dividends would not discharge the Canfield indebtedness. (cf. *Seattle Trust Co. v. Pitner*, 18 Wash. 401). This surplus, moreover, is not liquid. It has

long been invested, with minor exceptions, in the promissory notes of Josephine S. Scripps and B. H. Canfield, loans to affiliated corporations, and the stock purchase notes of employees. But more than this, I am not persuaded that under all of the circumstances the present surplus is excessive. *Tefft v. Schaefer,* 136 Wash. 302. Compare figures set forth in *Dodge v. Ford Motor Co.,* 170 N. W. 668 (Mich.).

"The prevailing system of treasury and reserve fund balances (hereinabove designated surplus) was long practiced, if not created, by Mr. Canfield. Neither Mr. Canfield nor those who derive their right, title and interest through him should be entitled to question what he did. *Marks v. American Brewing Co.,* 52 So. 983 (La.). The additions to the treasury and reserve fund balances since E. W. Scripps became chairman of the board are relatively negligible.

"The testimony relating to treasury and reserve fund balances, however, I have considered as a portion of the relevant facts in considering and determining the application of the dominant stockholder doctrine heretofore discussed. Such seems to be the view of plaintiffs. Indeed, only passing reference was made in their argument to the question of compelling further declaration of dividends. The complaint alleges only 'that if these funds were distributed in dividends to the stockholders of the corporations to which they belong, the proportion allocated to the stocks owned by the B. H. Canfield estate would be approximately sufficient to pay the Canfield notes, principal and interest.' (Paragraph XLIX.)

"In disposing of this general contention, I express no opinion as to whether or not this court has jurisdiction over foreign corporations, whether or not the board of trustees are necessary parties, or whether or not a formal demand is prerequisite.

"It is my considered opinion that the pledge agreements are binding, that the second lien is valid, that the loans were in default on November 15, 1932 (if not before), and that the notices of sale are sufficient.

"This court will presume that the sale will be conducted fairly and properly, with due regard to offering and selling the stocks in such a manner and in such

blocks as will secure the most therefor, and that the pledgee will 'use every reasonable means to obtain what the property is reasonably worth at the time of the sale.' 49 C. J. 1004, 1005.''

Our study of the record convinces us that the trial court correctly weighed the evidence and drew the proper conclusions therefrom. We find nothing in the evidence warranting the conclusion that the calling of the Canfield loans was actuated by bad faith, and as bad faith like fraud is never presumed, it follows that appellants have failed in their proof. Quite to the contrary, it affirmatively appears that Canfield, by the selfish use of his position, constantly increased his indebtedness over a long period of years; and although enjoying a munificent income, he used no part of it to retire or reduce this indebtedness. This course of conduct followed by the loss of his position (not shown to be other than justifiable) and the consequent lessening of his ability to pay, seems on its face to fully justify the course which was pursued.

We conclude that the judgment must be, and it is, affirmed.

BEALS, C. J., HOLCOMB, and GERAGHTY, JJ., concur.

BLAKE, J. (dissenting)—My divergence with the majority commences at the quotation from the memorandum opinion of the trial judge. With the facts theretofore stated and the drastic rules of law applicable thereto clearly in mind, I cannot accept the conclusions of the trial judge adopted here as the majority opinion.

Unless there was some peculiar reason for calling the Canfield loan, I do not think E. W. Scripps fulfilled his obligation to exercise good faith toward the pledgee, since he did not call the loans of Mrs. Scripps and other employees. The loans were all of the same character. They were all in the same class. His only

reason for singling out the Canfield loans and calling them was that the margin between the amount of the loans and the value of the stocks was so little as to make the investment unsafe. This reason, however, was based upon the book value of the stocks, which was never used as a transfer or trading value in the many sales of stock referred to in the record. Under all methods of valuation theretofore used, Canfield's stocks were worth at least three times as much as the amount for which they were pledged.

Without undertaking to arrive at the actual valuation of Canfield's holdings, we can determine the factor of safety of the loan by making a brief reference to the value of Star Publishing Company stock. Canfield owned 177 shares of that stock. The evidence showed recent transactions in that stock on the basis of three thousand dollars per share. H. B. R. Briggs, who for some years was assistant chairman of the board, testified that Star stock was worth $28,050 per share. By the rule of three, which was adopted as the basis valuation by Mrs. Scripps, Canfield and Sanders in their contract of October 22, 1921, the Star stock was worth that much at least. In that agreement, the rule of three is described as follows:

"Three times Annual Receipts from Circulation and Advertising.

"Circulation at $20 per name (yearly average paid circulation as shown by the monthly statements.)

. "Twenty times annual 'Net Profit' (not the 'Statement Profit') as now calculated in the regular monthly statements known as the Comparative Statements— sample attached.

"Total of these three items is then divided by three."

On any basis of calculation, other than book value, the Canfield holdings in the Star alone were worth $350,000 to $400,000.

At the time of the trial, the reserve fund investments

amounted to approximately $1,200,000. On the theory upon which Mrs. Scripps and Canfield had been borrowing from the reserve fund, Canfield's interest therein was almost, if not quite, equal to the amount of his indebtedness.

If the real reason for calling the Canfield loan was that the margin between the security and the indebtedness was so small as to render the loan a bad investment for treasury reserve funds, there was more reason to call at least one other loan. At the time the Canfield loan was called, Briggs was a borrower of reserve funds in excess of the value of the stocks held by Scripps as trustee to secure the loan. And the valuation was not computed upon the book value of Briggs' stocks. The valuation in this instance was computed on the cost of the stocks to Briggs, plus six per cent interest from date acquired. This method of valuation was devised to secure employees the return of principal, with a fair rate of interest, on their investments in stocks of the Scripps corporations. As we have seen, however, the sales were made to employees on the basis of real value of the stocks, and not on book values. On this basis of value, Briggs' collateral did not equal his loan, yet Scripps did not call it.

I stated that no call had been made on Mrs. Scripps. Respondents contend that her note was paid. This is how it was paid: Although no express trust was created by the will of James G. Scripps, it appears Mrs. Scripps was impressed by the idea that the stocks she inherited from her husband were held by her in trust for her children. This idea, however, did not take form in action until about the time the Canfield loan was called. A corporation was then formed, called the Scripps Newspapers, Incorporated. The capital stock consisted of two thousand shares; five hundred shares being issued to each of Mrs. Scripps'

four children. Then all of Mrs. Scripps' stocks were transferred to Scripps Newspapers, Incorporated.

The consideration for the transfer was the assumption of Mrs. Scripps' indebtedness of three hundred thousand dollars to the reserve fund. This indebtedness of Mrs. Scripps, which, with interest, now amounted to $316,847.06, was paid in the following manner: E. W. Scripps, as treasurer, drew a check for $316,847.06, payable to Scripps Newspapers, Incorporated. Then, as treasurer of Scripps Newspapers, Incorporated, he indorsed the check back to himself, as treasurer. He thereupon relinquished to Mrs. Scripps, as paid, her three hundred thousand dollar note, and took a note from Scripps Newspapers, Incorporated, for $316,847.06, to secure which he and his brother deposited with himself, as trustee, one thousand shares of stock of Scripps Newspapers, Incorporated.

The theory of the transaction, as I understand it, is this: By issuing the check to Scripps Newspapers, Incorporated, E. W. Scripps, as treasurer, loaned that company $316,847.06 of treasury reserve funds. When, as treasurer of Scripps Newspapers, Incorporated, he indorsed the check to himself as treasurer, Scripps Newspapers, Incorporated, thereby paid the debt evidenced by Mrs. Scripps' three hundred thousand dollar note. What actually transpired was that the obligation of Scripps Newspapers, Incorporated, was substituted for the obligation of Mrs. Scripps, and the status of the treasury fund remained exactly the same, except that the $316,847.06 of treasury reserve funds was loaned to the Scripps children, instead of Mrs. Scripps. The security for the loan consisted indirectly of the same stocks as secured the loan when evidenced by Mrs. Scripps' note of three hundred thousand dollars.

This transaction occurred December 15, 1932, after notice given of the intended sale of Canfield's stocks. As we have just seen, $16,847.06 interest was then unpaid on Mrs. Scripps' note. Contrast this with the condition of the Canfield loans. At that time, interest was in default on Canfield's obligations in a comparatively small sum, for Ann Murphy, after she was appointed special administratrix by the superior court of King county, collected the dividends on Canfield's stock and turned them over to E. W. Scripps, to be applied to interest on Canfield's obligations. The interest charges on the Canfield obligations for 1932 amounted to $15,201.37, while dividends on his stock for the same period amounted to $15,604.

My reading of this record has convinced me that Mr. Scripps, in calling the Canfield loans, was not motivated by any thought concerning the welfare of the corporations or minority stockholders. On the contrary, it is apparent that his purpose was to freeze out the Canfield heirs and acquire their stock for himself and the members of his family, for the amount of the Canfield indebtedness, which, as we have seen, is not more than a third or fourth of the actual value of the stock. It seems to me the chancellor's conscience is singularly dulled when a court of equity permits the consummation of such a transaction.