CECIL B. HIGHLAND, *Exr. v.* J. HORNOR DAVIS *et al.*

(No. 8588)

Submitted September 8, 1937. Decided December 7, 1937.

502

HATCHER, JUDGE, dissenting.

*R. S. Spilman, Steptoe & Johnson* and *James M. Guiher,* for appellants.

*Robinson & Stump* and *Lawrence R. Lynch,* for appellee.

RILEY, JUDGE:

Cecil B. Highland, sole executor and testamentary trustee of the last will and testament of Virgil L. Highland, deceased, brought this suit in equity in the Circuit Court of Harrison County against J. Hornor Davis, in his own right, The Exponent Company, a corporation, J. Hornor Davis and Anthony F. McCue, trustees, and Clarksburg Publishing Company, a corporation. From a final decree, wherein the court set aside a sale of 568 shares of class A common stock of the Clarksburg Publishing Company, made by J. Hornor Davis to The Exponent Company, on February 17, 1935, under a pledge as collateral security upon a note of the Highland estate, and permitted Highland in his fiduciary capacity to redeem the stock, Davis and The Exponent Company brought this appeal.

On July 1, 1927, the Clarksburg Telegram, a Republican evening paper, and the Clarksburg Exponent, a Democratic morning paper, were being published in Clarksburg. The decedent, Virgil L. Highland, owned a majority of the stock of the corporation which published the Clarksburg Telegram, and the appellant, J. Hornor Davis, owned a majority of the stock of The Exponent Company, which published the Clarksburg Exponent. At that time,

the Telegram had no up-to-date newspaper plant, and the Exponent was being published in a newspaper plant, constructed for that purpose. This being the situation in the newspaper field in Clarksburg, a new corporation was formed known as the Clarksburg Publishing Company, capitalized at $500,000.00, of which 2,000 shares of preferred stock in the amount of $200,000.00 were issued, and 3,000 shares of common stock in the total amount of $300,000.00. The common stock was divided into two classes, class A stock with 1,800 shares and class B stock with 1,200 shares. All the assets of the Clarksburg Telegram and the Exponent were sold and conveyed to this corporation. In consideration thereof, the stock of the corporation was issued as follows: To the nominees of Virgil L. Highland, 1,000 shares of the preferred stock in the amount of $100,000.00; to The Exponent Company, 1,000 shares of preferred stock in a like amount of $100,000.00; to Virgil L. Highland, or his nominees, the 1,800 shares of class A common stock; and to the Exponent Company, the 1,200 shares of class B common stock. At the institution of this suit, the class A common stock was owned as follows: 1656 shares by the estate of Virgil L. Highland; 72 shares by Wilbur E. Morrison, an old employee of Virgil L. Highland in the Clarksburg Telegram; and 72 shares by the plaintiff, Cecil B. Highland, individually. All of the 1,200 shares of the class B common stock originally issued to The Exponent Company was still owned by that company at the time this litigation was begun.

Simultaneously with the transfer of the assets of the two newspapers to the Clarksburg Publishing Company, a voting trust agreement was executed, which provided for the voting control and operation of the Clarksburg Publishing Company from the execution of the agreement on July 1, 1927, until January 1, 1943. Under this agreement, the holders of class A and class B stock were given equal control and voice in the business affairs and operation of the Clarksburg Publishing Company. The agreement also provided for a separate identity of the two newspapers in so far as their news policies and political positions were concerned. It further provided that

the Publishing Company was to be run by a board of six directors, three directors being chosen from the class A stockholders and three directors from the class B stockholders. No corporate action of importance could be taken without the affirmative vote of at least four directors. This trust agreement contained no interdiction upon the right of the class A stockholders to acquire the whole or any part of the outstanding class B stock, and on the other hand, the class B stockholders were not prevented from acquiring or buying a part or all of the outstanding class A stock. In this regard, it might be well to note that Paragraph THIRD of the trust agreement contains the following provisions:

"THIRD: COMMON STOCK. For the purpose of distinguishing and of identification, and for no other purpose, the shares of the common stock shall be divided into classes, A and B, and in the first instance there shall be issued one thousand, eight hundred (1,800) shares of class A stock, and one thousand, two hundred (1,200) shares of class B stock. Each share of both classes of common stock shall be equal in all respects with respect to the earnings and assets of the company with every other share, and with respect to the voting rights, and with respect to the voting rights or the rights of the holders of the legal title to such shares to vote the same at all meetings of the stockholders of the corporation and for all corporate purposes."

In 1930, Virgil L. Highland died. At the time of his death, the West Virginia Bank of Clarksburg had his collateral note, together with a trust certificate representing 568 shares of the class A stock as collateral security. This note was in the amount of $50,000.00, and contained an unrestricted right of the pledgee in the event of default to sell the collateral at public auction or private sale, after default without demand, advertisement or notice. This provision, verbatim, reads:

"Full authority is hereby given to the said West Virginia Bank, or any other holder of this note, to sell the said collaterals at public auction

or private sale, at any time after the maturity and non-performance of this promise, without demand, advertisement or notice; such demand, advertisement and notice being hereby expressly waived."

This note became due on December 4, 1930. Sometime after maturity, it was reduced to $45,000.00. On September 24, 1933, Cecil B. Highland, Melvin G. Sperry and the Empire National Bank of Clarksburg, the then executors of Virgil L. Highland's will, executed a new note in the amount of $45,000.00, payable to the order of the West Virginia Bank, 120 days after date. The original note was not surrendered to the executors when the new note was executed. In his bill of complaint, the appellee takes the position that the original note was not surrendered. On the other hand, in the answers, the appellants claim that the note of $45,000.00 was a renewal of the $50,000.00 note. Their position is not resumed in their briefs and oral argument. On the contrary, they say that the $45,000.00 note, together with the 568 shares of stock, were both collateral security to the original note of $50,000.00. The $45,000.00 note embodies a contract or pledge which reads, in part, as follows:

"Upon nonpayment of this note * * * this note * * * shall forthwith, at the option of the holder, become due and payable, without demand or notice, and full power and authority are hereby given to any holder hereof thereupon to sell, assign, and transfer the whole of said securities and property or any part thereof, or any substitutes thereof, or any additions thereto, at public or private sale, at the option of the holder, at such time or times, at such price and upon such terms as he or it may determine, without either demand, advertisement, or notice of any kind, all of which are hereby expressly waived. At any such sale, the holder thereof may purchase the whole or any part of the property sold, free from any right of redemption on the part of the undersigned, which is hereby waived and released."

On December 30, 1933, the West Virginia Bank was

closed and E. A. Rinehart appointed its receiver. Theretofore, the Highland loan had been hypothecated by said bank with the Reconstruction Finance Corporation at its Richmond office. Both notes, together with the trust certificate representing the 568 shares of class A stock, were held by said corporation. During the course of the administration of the estate of Virgil L. Highland, which, so far as the record discloses, has not been completely settled, the Reconstruction Finance Corporation filed its proof of claim before the commissioner of accounts, basing its proof on the $50,000.00 note and setting forth that the $45,000.00 note, together with the 568 shares of stock, were collateral security therefor. On December 4, 1930, the $50,000.00 note became due, and no part of the principal was paid except the reduction of $5,000.00. On January 22, 1934, the $45,000.00 note became due. No part of its principal had been paid at the time of the alleged sale and purchase by Davis. The last payment of interest was made on December 30, 1934.

In December, 1933, as the result of the litigation terminating in this court in the case of *Highland* v. *Empire National Bank et al.*, 114 W. Va. 473, 172 S. E. 544, Cecil B. Highland became the sole executor and testamentary trustee under the will of Virgil L. Highland, deceased. Under the organization provided by the voting trust, A. F. McCue became the voting trustee for the class A stockholders, having succeeded Virgil L. Highland, then deceased, and the defendant, J. Hornor Davis, the original voting trustee for the class B stockholders, remained as such. The directors representing the class A stock were A. F. McCue, Cecil B. Highland and Mrs. Virgil L. Highland, and the directors for the class B stock were J. Hornor Davis, W. Guy Tetrick, general manager of the Clarksburg Publishing Company, and Mrs. J. Carl Vance, the latter of whom succeeded one West, an original director. Sometime after the death of Virgil L. Highland, a meeting was held for the purpose of reorganizing the Publishing Company. Cecil B. Highland apparently desired to be made president. It is contended by the appellants that as a result of a compromise, they agreed to join in his election; that this compromise resulted from

the promise by Highland not to interfere with the general manager of the company and not to give publicity to the election of officers. Appellants claim that both these promises were broken. On the other hand, Highland claims that he did not make any such promise, and on this point, he failed to call as witnesses either McCue or Mrs. Highland.

The annual meeting in 1935 fell on January 15th, but it was not called because, so the defendants assert, Highland failed to give McCue, trustee, a list of his nominees for director. Appellants say that under article XXVI of the by-laws of the Publishing Company, Highland ceased after that date to remain president of the company. This article reads as follows:

> "The term of all officers, including the officers elected at the first general meeting of the board, shall expire at the close of Monday preceding the third Tuesday in January of each year, beginning with the year A. D., 1928, and, on the expiration of his term, each person shall cease to be such officer, and shall not hold over, and thereafter, unless re-elected, exercise any of the rights and authority of such officer. The secretary, treasurer, assistant treasurer, general manager, and business manager need not be directors of the corporation. Any two or more of such offices may be filled by the same person."

On January 19, 1935, Davis left for Miami, Florida, after having been unable to obtain any assurance as to when a meeting could be held. Two days later, on January 21, 1935, Highland notified Tetrick, the general manager, that he intended to move down to the newspaper plant. He wrote Tetrick a letter dated January 25, 1935, advising him of this intention. On January 28, 1935, Highland moved into the general manager's office at the newspaper plant, formerly occupied by Tetrick. Tetrick's furniture and personal belongings were put out in the hall, his name was erased from the door, and Highland's name was substituted thereon as president of the Publishing Company. When Davis learned of the hap-

penings at the plant, he returned to Clarksburg, arriving on February 6, 1935. Appellants complain of Highland's allegedly unjustified actions at the newspaper plant during Davis' absence. The record likewise contains excerpts of newspaper articles published in the Clarksburg Telegram, presumably by Highland, as to the control of that paper by the Highland estate, and the progress of this litigation. It is needless to go in detail into this testimony. Sufficient it is to say that, according to the evidence introduced on behalf of appellants, an emergency was created by Highland's actions which prompted Davis as a matter of protection to decide to buy the block of 568 shares of the common stock in hypothecation with the Reconstruction Finance Corporation. At this point, it is well to remember that on several occasions, Rinehart, the receiver for the defunct bank, had mentioned to Davis that this block of stock was for sale. On his return from Florida, Davis announced to Rinehart that he was desirous of acquiring this block of stock. Thereupon, he went to Richmond, accompanied by Rinehart, where, on February 16, 1935, they went together to the office of the Reconstruction Finance Corporation. The representative of the corporation told Davis that the corporation would not sell the collateral separate from the obligation. After some delay occasioned over the way the draft for payment of the note was made, Davis paid to the receiver of the West Virginia Bank the sum of $45,360.00 (being in full the principal amount with accrued interest due on the debt). The $45,000.00 note had been indorsed to the Reconstruction Finance Corporation. The original note was in the hands of that corporation, without indorsement. After canceling the indorsement on the $45,000.00 note, the receiver indorsed it to Davis without recourse, and the trust certificate evidencing the 568 shares of stock, to which was attached a power of attorney signed in blank by Virgil L. Highland, was delivered to Davis coincidentally. Davis then requested the original $50,000.00 note which had been kept attached to the $45,000.00 note, but Rinehart declined to give it to him, assigning as his reason that he desired to surrender it to the executor of the Highland estate.

When the purchase was completed, Davis and Rinehart drove back to Clarksburg where they arrived about eleven o'clock on Sunday morning, February 17, 1935. Promptly upon his return, Davis called a meeting of the board of directors of The Exponent Company for two-thirty P. M. on the same day. At that time, there were five directors, Davis, Tetrick, Hugh Jarvis, Louis A. Johnson and Mrs. J. Carl Vance. Mrs. Vance was absent from the city, but wired a waiver of notice. Four directors were in attendance at this meeting. Davis offered to sell the 568 shares of class A stock to the Exponent for the price which he himself had paid, to-wit, $45,360.00, and this offer was accepted. He then was given a check of The Exponent Company for this amount, and the trust certificate representing the stock was delivered to Tetrick, the then secretary of the company.

On the basis of $45,360.00, appellants say the stock had a value of $80.00 per share. Tetrick, Davis, Jarvis and Mrs. Vance all testified that in buying the stock, the directors of The Exponent Company never thought of the possibility of making a profit. Be that as it may, it is undoubtedly true, as shown by the record, that Davis, in purchasing the stock and the $45,000.00 note from the Reconstruction Finance Corporation, was representing, as he testified, The Exponent Company. On the following morning, to-wit, February 18, 1935, at eight o'clock, the four directors of The Exponent Company met again and ratified the action taken on the preceding day. This action was assented to in writing by Mrs. Vance a few days later, upon her return to Clarksburg. After the sale of the stock to The Exponent Company, Davis wrote on the back of the $45,000.00 note that it had been discharged by the sale of the collateral, and the note, with this indorsement thereon, was tendered to appellee's counsel of record, who refused to accept it.

Late in the afternoon of February 17, 1935, so Highland testified, he was informed that Davis had purchased the note and collateral on the previous day. He then, on the following day, as executor, instituted a suit in chancery against Davis and others in which he sought either

a redemption of the stock or a sale by the court, and secured *ex parte* a temporary injunction. The present suit was instituted shortly thereafter when he learned that Davis had already sold the 568 shares of stock to The Exponent Company. In this suit, The Exponent Company was added as a party and the plaintiff sought the same relief as in the original suit.

In their answers, The Exponent Company and Davis deny that Highland had any right to redeem the stock. They aver that an adequate price had been paid for the stock and that under the provisions of the contract of pledge, he was not entitled to any notice of the sale, and, by his own misconduct, was barred from any equitable relief.

Appellee's theory of the case is that Davis purchased the note and collateral from the Reconstruction Finance Corporation and thereby became a pledgee; that representing, as he did, The Exponent Company, that company in turn stood in the position of a pledgee and was obliged to use good faith toward the pledgor; that the sale was not made in good faith and was made for an inadequate price; and that Highland's conduct, even if inequitable, was in his individual and not executorial capacity, and was not connected with the transaction so as to preclude him from relief in equity. On the other hand, appellants' theory is to the effect (1) that the $45,000.00 note was not a renewal of the $50,000.00 note, but was collateral, together with the 568 shares of stock, and that by the purchase, Davis simply bought the collateral and therefore was not a pledgee; (2) that if Davis purchased the note and collateral representing The Exponent Company, the sale, though made without notice, was valid under the express and clear provisions of the contract of pledge contained in the $45,000.00 note, and was made in good faith for an adequate price; and (3) that Highland's conduct was such as would preclude him from relief.

Under these conflicting theories, there are three issues. (1) Was Davis a pledgee? (2) If so, did he use good faith in purchasing the note and collateral and selling the collateral to The Exponent Company? And (3) did Highland's conduct preclude him from relief?

In deciding the case in favor of the appellee and decreeing his right to redeem the stock, the trial chancellor, in effect, held that Davis was the agent of The Exponent Company; that in the purchase of the note, Davis became a pledgee; that the sale was made in bad faith, and that Highland's conduct, if inequitable, was not sufficiently connected with the transaction so as to preclude recovery.

The first question which arises on this appeal, as suggested by appellee's counsel, is whether the Richmond transaction on February 16, 1935, was (1) a sale of the collateral to Davis by the Reconstruction Finance Corporation as pledgee in discharge of the $50,000.00 note, or (2) a transfer to Davis of the $45,000.00 note secured by a pledge of the stock. In the event the first contingency is true, Davis never occupied the status of pledgee, and in which event, the appellee's case should fail. We are, however, impressed with the fact that the Reconstruction Finance Corporation, through its Richmond representative, told Davis that the corporation was unwilling to sell to him the collateral loan. From the record itself, it appears that Davis actually believed he was purchasing the $45,000.00 note and collateral. But counsel say that the test of this transaction is *"the legal effect of what the parties actually did"* and not what they thought they were doing. Be that as it may, courts are unable to penetrate the inner processes of human thought and parties are bound by their words and their actions. Clearly, the words and actions of the parties at the time the transaction was actually consummated indicate that the Reconstruction Finance Corporation intended to sell and Davis intended to buy the $45,000.00 note with collateral attached. That being so, Davis became a pledgee, and stood in the shoes of the Reconstruction Finance Corporation. But counsel for appellants rely on the fact that the Reconstruction Finance Corporation filed its claim against the Highland estate before the commissioner of accounts upon the $50,000.00 note, stating therein that the $45,000.00 note was held as collateral. This action of the Reconstruction Finance Corporation, whether inadvertent or not, cannot alter the legal effect of a transaction which came into being as a result of the clear

actions and express words of the parties. In conclusion on this question, we find nothing in the pleadings which would indicate that either party regarded the transaction other than a sale of the $45,000.00 note with collateral. Appellants, in their answers, refer to the $45,000.00 note as a renewal note, and the clause of the bill of complaint, relied on strongly by appellee's counsel, to the effect that the $50,000.00 note was at all times retained by said West Virginia Bank and was never surrendered, is simply a statement of the law governing the status of an original note after its renewal. *Wolfe* v. *Kelley et al.*, 119 W. Va. 428, 194 S. E. 77. The $45,000.00 note, under the record in this case, undoubtedly was a renewal of the $50,-000.00 note. In this regard, appellee's situation is strengthened by the fact that the $50,000.00 note was never indorsed to the Reconstruction Finance Corporation, while the $45,000.00 note was executed by the executors of the Highland estate, and also recited the stock as collateral security.

Davis being a pledgee under the $45,000.00 note, it becomes necessary to determine his rights under the pledge agreement in said note. It is to be noted that both the notes provide for the sale of the collateral after maturity of the notes at private sale and without notice to the pledgor. The provision of the $50,000.00 note does not include the right of the pledgee to purchase the collateral. However, the pledge agreement in this note was sufficiently broad to permit the Reconstruction Finance Corporation to sell the $45,000.00 note and the collateral to Davis. Generally, at common law, a pledgee of collateral security to secure a note, has no right, in the absence of an express agreement, to sell the collateral without notice to the pledgor. This rule of law is not so deeply grounded in public policy that the parties cannot waive it. As a matter of fact, it is well settled in this state that the parties may waive their rights to notice of sale under a pledge agreement. *Berry, Receiver* v. *Neuhardt*, 117 W. Va. 67, 183 S. E. 858; *First National Bank of New Martinsville* v. *Neuhardt*, 117 W. Va. 70, 183 S. E. 859; *Fisher, Executrix*, v. *Neuhardt*, 117 W. Va. 80, 183 S. E. 861. This position is amply supported by general authority.

*Hiscock* v. *Varick Bank*, 206 U. S. 28, 27 Sup. Ct. 681, 51 L. Ed. 945; *Empire National Bank of Clarksburg* v. *High-Grade Oil Refining Co.*, 260 Pa. 255, 103 Atl. 602; *Wilkes et al.* v. *Allegan Fruit & Produce Co. et al.*, 233 Mich. 215, 206 N. W. 483; *Judy* v. *White*, 238 Ky. 547, 38 S. W. (2d) 444; *Thorton, Admr. et al.* v. *Martin*, 116 Ga. 115, 42 S. E. 348; *Ardmore State Bank* v. *Mason*, 30 Okla. 568, 120 Pac. 1080, 39 L. R. A. (N. S.) 292; *Carson* v. *Iowa City Gas-Light Co.*, 80 Iowa 638, 43 N. W. 1068; *Reid's, Admr.* v. *Windsor*, 111 Va. 825, 69 S. E. 1101; *Atlantic National Bank of Boston* v. *Korrick et al.*, 29 Ariz. 468, 242 Pac. 1009, 43 A. L. R. 1184; *Whitman* v. *Boston Terminal Refrigerating Co.*, 233 Mass. 386, 124 N. E. 43; 21 R. C. L., sec. 50, p. 690.

The record discloses that Davis, in purchasing the $45,-000.00 note, together with the collateral, was in fact representing The Exponent Company. He himself testified that he was representing the company, and the evidence clearly shows that the money used to effect the purchase was advanced through The Exponent Company. But whether Davis purchased the note and collateral for himself or for The Exponent Company becomes moot in view of the well-established rule that a pledgee, when the express terms of the pledge so provide, may purchase under the pledge agreement. Such agreements are commonplace in modern business relations. Time and again, the courts of this country have held them valid. *Hayward* v. *Eliot Nat. Bank*, 96 U. S. 611, 24 L. Ed. 855; *Hiscock* v. *Varick Bank, supra; Peacock* v. *Phillips*, 247 Ill. 467, 93 N. E. 415, 32 L. R. A. (N. S.) 42; *Farmers' Nat. Bank* v. *Venner*, 192 Mass. 531, 78 N. E. 540, 7 Ann. Cas. 690; *Baker* v. *Drake*, 66 N. Y. 518, 23 Am. Rep. 80; *Penn Mutual Life Ins. Co.* v. *Bancroft*, 207 Ala. 617, 93 So. 566, 28 A. L. R. 1102; *Seder* v. *Gould*, 274 Mass. 223, 174 N. E. 311, 76 A. L. R. 700.

Because Davis purchased the $45,000.00 note with collateral attached, he thereby became pledgee and stood in the shoes of the Reconstruction Finance Corporation. As such pledgee, he was bound to use good faith. "In making the sale the pledgee is regarded as acting as a trustee, or agent of the pledgor, and accordingly must

act fairly and in good faith, and with a reasonable degree of skill and diligence, to secure a fair price for the property, and to conserve the interests of the pledgor and of other persons concerned, as well as to secure and protect the pledgee's own rights or interests. These rules apply although the pledgee is authorized to sell without appraisement, advertisement or notice, or to purchase for himself." 49 Corpus Juris, section 262, pp. 1004, 1005. See also, cases cited by appellee's counsel: *Eppert* v. *Lowish,* 91 Ind. App. 231, 168 N. E. 616, 169 N. E. 884; *State Trust & Savings Bank* v. *Dunn,* 24 Fed. (2d) 477; *Dodge et al.* v. *Scripps et al.,* 179 Wash. 308, 37 P. (2d) 896; *Southern Exchange Bank* v. *Langston,* 33 Ga. App. 477, 127 S. E. 230; *Dibert* v. *Wernicke,* 214 Fed. 673; *Williams* v. *Herman,* 216 Iowa 499, 249 N. W. 215; *United Bank & Trust Co.* v. *Jones,* 30 Ariz. 557, 249 Pac. 747. We do not differ from this general rule as established by the foregoing authorities. However, the relation between a pledgor and a pledgee is not that of guarantor and guarantee. The pledgee is not bound to conserve the interests of the pledgor in all events, and in contravention of the powers resided in him under the pledge agreement and to his own detriment. His obligation does not extend beyond the exercise of "ordinary diligence," that is, the diligence which an ordinary prudent man would exercise in the conduct of his own business. *First National Bank of Birmingham* v. *Forman,* 230 Ala. 185, 160 So. 109.

In the consideration of this case, we have ever kept in mind that Davis with the purchase of the note and collateral became vested with the full legal right to sell the collateral, a right which he could exercise in all events circumscribed only by the duty to use good faith toward the pledgor. At this late date in the development of the law of pledges, it would be far afield, in the light of the authorities and every day business practices, from what we nowadays regard as sound legal reasoning, to withhold from him that right. To do so, in the instant case, would, in other cases yet to follow, be dangerously apt to destroy the integrity of business relations involving the law of negotiable instruments and pledges which are so essential to modern American business.

But, appellee's counsel say that the sale was in contravention of the letter and spirit of the trust agreement. Certainly we are not concerned with the abstract proposition that the transaction in question violated the spirit of the agreement. We cannot go afield from the interpretation of the agreement based on its express wording and in the light of the situation of the parties. New conditions, suggested by the instant case, should not be incorporated into the agreement. Our concern is, and necessarily so, with the legal purport of its express provisions. The effect of that agreement is no different than it was on July 1, 1927, when first executed. Then, Virgil L. Highland and Davis were the motivating parties, and the acrimony indicated by the record had not come into being. The agreement contains no express interdiction against the owners of either class of common stock purchasing a part, or all, of the stock of the other class. In fact, its provisions would indicate otherwise.

The common stock of the corporation, under the agreement, was divided into two classes for an expressly limited purpose, that is, for *"the purpose of distinguishing and of identification, and for no other purpose."* Even if the underlying purpose of the agreement was to keep, during its life, equal control between Highland and his associates and Davis and his associates, factually, this purpose was not thwarted by the sale. We use the word "factually" advisedly, because a majority of the class A stock had a right to select three of the six directors of the publishing company, and Cecil B. Highland, as executor and individually, had a clear majority of the class A stock, exclusive of the 568 shares in controversy. This factual situation becomes most important because this case is in chancery, and therefore, we are concerned with substance and not form. *Abercrombie* v. *Brinkman* (C. C. A., W. Va.), 293 Fed. 375; 10 R. C. L. 380, sec. 130; 1 Pomeroy (4th Ed.), sec. 378; *Schumacher* v. *Eastern Bank & Trust Co.*, 52 F. (2d) 925, 926; *Riggs* v. *Armstrong*, 23 W. Va. 760; *Skaggs* v. *Mann*, 46 W. Va. 209, 33 S. E. 110; *McLanahan* v. *Mills*, 73 W. Va. 246, 253, 80 S. E. 351.

We are therefore constrained to view this case without regard to the trust agreement, because there is nothing

in that agreement which, under the facts herein, would alter the relations of the parties. In doing so, we are mindful that the execution of the $45,000.00 note was a voluntary obligation of the Highland estate; that its terms were consonant with the prevailing law governing notes such as this; that the Reconstruction Finance Corporation, as well as Davis, had a right to sell the note with collateral at private sale and without notice; and that the sale, in view of the record, was for a substantial price. Under all these circumstances, we are of opinion that the learned trial chancellor was not justified, in the absence of an adjudication that the sale price was so grossly inadequate as would indicate a *mala fide* attempt of Davis and his associates to obtain the stock at a price clearly below its true value, in decreeing that the sale was made in bad faith. A careful reading of the record and briefs leaves us unconvinced that, in all the particulars considered by the trial chancellor, the indicia of fraud or bad faith were present. The sale, therefore, remains invulnerable, unless a clear showing of bad faith, based on inadequacy of price, is shown. We say this because Davis and his associates have kept within the express provisions of the pledge agreement set forth in the note. They were simply carrying out powers which were resided in them as a result in the first instance of the voluntary agreement of Virgil L. Highland, the execution of the collateral note by the executors of his will, and the sale of that note to Davis by the Reconstruction Finance Corporation. The sale was made within the express powers of the pledge agreement, and is not in contravention of the trust agreement.

On the question of the inadequacy of the price, the evidence is in conflict; yet in solving the question of good or bad faith, the trial chancellor did so without considering whether or not the price was grossly inadequate as a badge of bad faith, as shown by the court's opinion, incorporated as part of the decree, and the adjudication of court on the motion to strike. (See case of *Robertson* v. *Vandergrift et al.*, 119 W. Va. 219, 193 S. E. 62, as to effect of opinion of trial court). On this point alone, the case should be remanded. This court will not, in the

first instance, consider questions not yet acted upon by the trial court. *Nuzum* v. *Nuzum*, 77 W. Va. 202, 87 S. E. 463; *Rice* v. *Rice*, 88 W. Va. 54, 60, 106 S. E. 237; *Woods* v. *Campbell*, 45 W. Va. 203, 32 S. E. 208; *Farmers' Bank of Fairmont* v. *Gould*, 42 W. Va. 132, 24 S. E. 547; *Kesler* v. *Lapham*, 46 W. Va. 293, 33 S. E. 289; *Cobb* v. *Railway Co.*, 35 W. Va. 65, 12 S. E. 1097; *Harris* v. *Hauser*, 26 W. Va. 595. Of course, the parties retain the right to review, in this court, the chancellor's adjudication on remand. *Rice* v. *Rice, supra.* Unless, on the remand, the trial chancellor should arrive at the conclusion that the price was so grossly inadequate as to indicate bad faith, the sale should not be set aside and the plaintiff should not be entitled to redeem. Here, we note that all of the cases cited by appellee's counsel, on the question of good faith, except two, have regarded adequacy of price as a material matter, and these two cases are not in point with the instant case.

The record and briefs are replete with recitals of Cecil B. Highland's conduct which appellants' counsel claim led up to the sale. Appellee, however, claims that the conduct complained of, even if inequitable, was concerned solely with the internal affairs of The Clarksburg Publishing Company, while the instant controversy involves the sale of collateral pledged as security for a debt of the Highland estate to the Reconstruction Finance Corporation, assignee of the West Virginia Bank. The trial chancellor held that these actions were not sufficiently connected with the sale to preclude the appellee in this suit under the clean-hands doctrine. See *Bias* v. *Bias*, 109 W. Va. 621, 155 S. E. 898; *Heck* v. *Morgan*, 88 W. Va. 102, 106 S. E. 413; *Ihrig* v. *Ihrig*, 78 W. Va. 360, 365, 88 S. E. 1010; *Peters* v. *Case*, 62 W. Va. 33, 40, 57 S. E. 733, 13 L. R. A. (N. S.) 408; *Trice* v. *Comstock*, 121 Fed. 620, 61 L. R. A. 176; *Foster* v. *Winchester*, 92 Ala. 497, 9 So. 83; *Kinner* v. *Lake Shore & M. S. Ry. Co.*, 69 Ohio St. 339, 69 N. E. 614; Beach, Modern Equity Jurisprudence, Vol. 1, section 16; Pomeroy, Equity Jurisprudence (4th Ed.), Vol. 1, section 399; Story, Equity Jurisprudence (14th Ed.), Vol. 1, sec. 100. On this point, his ruling is in accord with our view of the law and should not be reversed

for that reason. *Spradling* v. *Spradling*, 118 W. Va. 308, 190 S. E. 537; *Wade* v. *Wade*, 115 W. Va. 132, 174 S. E. 787; *First Nat. Bank* v. *McCloud*, 112 W. Va. 537, 540, 165 S. E. 799; *Davis* v. *Trust Co.*, 107 W. Va. 141, 147 S. E. 490; *Kincaid* v. *Evans*, 106 W .Va. 605, 146 S. E. 620. It, therefore, becomes unnecessary for us to consider appellee's suggestion that the Highland estate cannot be bound by the executor's conduct in his individual capacity.

For the foregoing reasons, we reverse the decree of the circuit court and remand this case to be dealt with in accordance with the principles herein contained.

*Reversed and remanded.*

HATCHER, JUDGE, dissenting:

A. The authority given the holder of the Highland note upon its non-payment was to sell the collateral at public or private sale, with the right to the holder "at any such sale" to purchase "the property sold." Since this authority is in contravention of the pledgor's common law rights, the contract of pledge, if unambiguous, "will be strictly construed * * * and in order that the sale and purchase be valid and effectual to pass title to him, the pledgee must bring .himself strictly within their terms." Annotation, 76 A. L. R. 717. The words in the Highland note are plain and conferred on the holder but two rights only—the right to sell and the right to purchase at the sale. There is no question even but that Davis represented the Exponent Company in purchasing the note. He testified that he did, and that he purchased with Exponent's money. The majority opinion says "it is undoubtedly true" that he did so. That being true beyond peradventure, Exponent, not Davis, its agent, succeeded the Finance Corporation, as holder of the note and pledgee of the collateral; its pretended sale by Davis to Exponent was farcical because he was not the pledgee; and in legal effect, what happened was merely the appropriation by Exponent of the collateral in satisfaction of the note. This appropriation was not a sale and un-

der the express terms of the Highland note only a sale was permissible. "The term 'private sale' comprehends something more than a mere taking over of the property by the pledgee at such price as he may elect to consider an offer. * * * The agreement then that the pledgee may become purchaser at a private sale, must be taken as meaning at a sale conducted in the manner usually and ordinarily followed in relation to private sales of property. A sale of property is a contract, and like every other contract requires an agreement between two or more. The mere taking over of the property without any agreement with another competent to contract is not a sale in our opinion." *Lowe* v. *Ozmun,* 3 Cal. App. 387, 86 P. 729, 732. Accord: *Union & Mercantile Trust Co.* v. *Harnwell,* 158 Ark. 295, 250 S. W. 321, 323; *Jennings* v. *Wyzanski,* 188 Mass. 285, 74 N. E. 347; *Cole* v. *Manufacturers Trust Co.,* 164 Misc. 741, 299 N. Y. S. 416. The sale "must be a *bona fide* sale, and not a colorable one merely." *Union Bank & Trust Co.* v. *Jones,* 30 Ariz. 557, 249 Pac. 747, 749. These cases are not cited merely for purpose of argument. I have been unable to find any well-considered cases materially variant, and, least of all, the seven cases cited in the majority opinion on the right of a pledgee to purchase under a pledge agreement. A brief digest of the facts of each case demonstrates my statement. (1) *Hayward* v. *Eliot Nat. Bank,* 96 U. S. 611, 24 L. Ed. 855. The collateral was sold by the bank to third parties after notice to and without objection from the pledgor. (2) *Hiscock* v. *Varick Bank,* 206 U. S. 28, 27 S. Ct. 681, 51 L. Ed. 945. The collateral was sold without notice under a contract permitting such sale and was purchased by the pledgee, the bank. But the sale was made by a duly licensed auctioneer at public auction in the salesrooms of the New York Real Estate Office. (3) *Peacock* v. *Phillips,* 247 Ill. 467, 93 N. E. 415, 32 L. R. A. (N. S.) 42. The pledgee sold the pledged property to a third person, who was held to have obtained no greater rights than the pledgee. (4) *Farmers' Nat. Bank* v. *Venner,* 192 Mass. 531, 78 N. E. 540, 7 Ann. Cas. 690. The collateral was purchased by the pledgee under a contract authorizing the purchase, but the sale was conducted by

"reputable auctioneers at one of the regular auction sales * * * at the New York Real Estate Salesroom." There was evidence warranting actual notice to pledgor, and also notice by public newspaper advertisement. (5) *Baker* v. *Drake,* 66 N. Y. 518, 23 Am. Rep. 80. This was a sale without notice, according to the alleged usage of the New York Stock Exchange, of stock purchased by a broker for a customer upon a margin, when the stock declined and the customer failed to furnish additional margin. (6) *Penn Mut. Life Ins. Co.* v. *Bancroft,* 207 Ala. 617, 93 So. 566, 568, 28 A. L. R. 1102. An insurance policy having a cash surrender value, insufficient to pay amount borrowed by insured from the insurer, was cancelled by the latter, after "numerous notices were shown to have been given insured in regard to default in the payment." (7) *Seder* v. *Gould,* 274 Mass. 223, 174 N. E. 311, 76 A. L. R. 700. An agreed statement shows that "the pledgee duly sold the collateral note and mortgage in accordance with the terms of the principal note." What were those terms is not stated. The court refused to consider a contention that the sale was invalid because the agreed statement precluded the contention.

The facts in the seven foregoing cases are so different from the facts in the suit at bar, that the principles governing those cases are essentially irrelevant here.

B. Many decisions hold that the pledgee, in exercising his powers, owes "the utmost" or "the strictest" good faith to the pledgor. *Dodge* v. *Scripps,* 179 Wash. 308, 37 P. (2d) 896, 899, *et seq.; National Mill Supply Co.* v. *Morton,* (Ind. Sup.) 6 N. E. (2d) 543, 109 A. L. R. 1101. I do not object to the milder statement of the rule by the majority that the pledgee "must act in good faith" since even ordinary good faith requires that the pledgee make an honest attempt "to sell to the advantage of the pledgor." 12 Fletcher, Cyc. Corp. sec. 5663. Accord: *German-American State Bank* v. *Spokane Columbia River etc. Co.,* 49 Wash. 359, 95 P. 261, 262; *Moses* v. *Grainger,* 106 Tenn. 7, 22 Pickle 7, 58 S. W. 1067, 53 L. R. A. 857; *Schaaf* v. *Fries,* 90 Mo. App. 111; Jones, Pledges

(3d), sec. 732. Exponent utterly disregarded this requirement. The leading case on this subject, perhaps, is *Montague* v. *Dawes,* 14 Allen (Mass.) 369, 373, wherein the court said: "One who undertakes to execute a power of sale is bound to the observance of * * * a suitable regard for the interests of his principal. He cannot shelter himself under a bare literal compliance with the conditions imposed by the terms of the power. He must use a reasonable degree of effort and diligence to secure and protect the interests of the party who intrusts him with the power." A suitable regard for the interests of the Highland estate—a reasonable degree of effort to protect its interests—would have impelled Exponent to see if third parties, likely to be interested, would pay more than the face of the note for the collateral. "The appellant in making sale of the note was a trustee for its debtor and pledgor, and it was appellant's duty to adopt all reasonable modes of procedure in order to render the sale most beneficial to the debtor. It could not discharge this duty by simply resolving in its own mind that the property pledged was worth no more than the debt of the pledgor." *Union & Mercantile Trust Co.* v. *Harnwell, supra.* Accord: *Louisville Trust Co.* v. *Drewry,* 266 Ky. 279, 98 S. W. (2d) 900, 902. Davis testified that the value of the collateral was not even discussed by him and the other directors of Exponent. Thus his own testimony affirmatively shows that neither he nor Exponent paid the slightest regard to the interests of the Highland estate. On the contrary, their sole purpose was to secure an advantage over the estate.

C. John Sabotka was the field agent of Finance Corporation. Cecil Highland testified, without contradiction, that in February or March of 1934, Sabotka, after obtaining information of the condition of the Highland estate and of the value of the collateral on the note in question, "assured" the witness "that he would not embarrass the Highland estate, that all they. (Finance Corporation) desired was (for Highland) to pay the interest and let the principal ride until conditions got better." This assurance naturally caused Cecil Highland to understand

that the collateral would not be suddenly sold to pay the note, and was in effect a waiver of the right to do so. That waiver was never recalled. I do not overlook a subsequent letter to Cecil Highland from Finance Corporation, dated August 29, 1934, stating that in February, he had been requested to pay the note to Sabotka, and that the letter was to advise "that it will be satisfactory for you to make payment as indicated above, or to the receiver of the above bank (West Virginia Bank at Clarksburg)." This letter does not purport to demand payment immediate or otherwise, and there is nothing in the conduct of Finance Corporation indicating that the letter should have been taken to portend precipitate action. On the contrary, two days later, Finance Corporation filed proof of its claim (the note) against the Highland estate, before the commissioner of accounts, who had in charge the settlement of the estate. This act indicated that Finance Corporation would await the result of that settlement, at least for awhile, and lulled Cecil Highland into a deeper sense of security regarding the collateral with the note. A construction that the letter of August 29th was a demand for immediate payment, and as such terminated the understanding between Cecil Highland and Sabotka, would be so strained, I could not countenance it. That the right to sell collateral without notice may be waived by a pledgee "either by express terms or a course of dealing", is said to be "a well-established principle in every system of enlightened jurisprudence." *Miller & Co.* v. *Lyons,* 113 Va. 275, 289, 290, 74 S. E. 194, 200. No new or independent consideration is required to support such a waiver. *United States Trust Co.* v. *Blundon,* 42 App. (D. C.) 500; *Toplitz* v. *Bauer,* 161 N. Y. 325, 55 N. E. 1059, 1061; Fletcher, *supra,* sec. 5662. In case of waiver a subsequent sale without notice is unauthorized. *Musser* v. *McCormick & Co.,* 57 Utah 62, 67-8, 192 Pac. 1052; Fletcher, *supra;* 59 C. J. Pledges, sec. 255. It is therefore apparent to me that Finance Corporation could not have sold the collateral lawfully without notice to the Highland estate. "The pledgee doubtless has the right to exact strict performance of the contract according to its terms, and, upon default in the payment of the debt at the time stip-

ulated, he may, under a contract like this, dispose of the pledge. But if he waives the right to exact strict performance, and gives time and indulgence to the debtor, he cannot recall this waiver at his own option, without notice to the pledgor, to the end that the latter may have an opportunity of protecting the pledge. The good faith which the law exacts from a person dealing with trust property will not permit the pledgee, after having once waived the forfeiture or the right to dispose of the pledge upon default of payment at the prescribed time, to suddenly stop short and insist upon the forfeiture for the nonpayment of the debt when the other is unprepared to redeem." *Toplitz* v. *Bauer, supra.* When Exponent purchased the Highland note it was overdue. Therefore, Exponent took the note subject to Sabotka's waiver of the right to sell the collateral without notice. "One who acquires negotiable paper after maturity takes it, in the absence of statutory modification, subject to all equities and defenses arising out of the paper itself and attaching to it, or out of the transaction with reference to which the paper was made, or of any agreement between the original parties with relation to the instrument." *Clemmer* v. *Bowlby,* 109 W. Va. 105, 153 S. E. 311, 312. The majority opinion recognizes the sequence, saying not once, but twice, that Davis "stood in the shoes of the Reconstruction Finance Corporation." But he and Exponent kicked off the shoes, and the opinion excuses that breach of trusteeship, seemingly because of the personal antagonism existing between them and Cecil Highland. No authority is cited and I have found none which justifies a pledgee's violation of his trust because he is at outs with the pledgor.

D. In any event, I am of opinion that the rule requiring gross inadequacy of price is irrelevant here. That rule applies where there is no evidence, or but slight evidence of bad faith except inadequacy of price. Where other indicia of inequitable conduct are pronounced, as here, slight inadequacy suffices.

I would affirm the circuit court.